DENISON v. EMERY.

(Circuit Court, N. D. Ohio, E. D. April 24, 1907.)

No. 7,019.

1. INSOLVENCY — STOCKBROKERS — DISTRIBUTION OF PROCEEDS OF PLEDGED STOCKS.

Insolvents were engaged in business as stockbrokers, and were given an order by petitioner to purchase certain stocks. This order they executed through a correspondent firm, which purchased the stock, advanced the money to pay for the same, and charged the amount to the general account of the insolvents, holding the stock as security for such account according to the usual custom between brokers. On being presented with a bill by insolvents, petitioner paid the same, and the insolvents promised to have the shares transferred to his name and to deliver the same. They did not do so, however, nor remit the price to their correspondent, which on their failure sold the stock with other stocks bought for bankrupts on margin for customers to cover a balance due from them on their account. The proceeds of all of the stocks so sold exceeded the amount due, and the excess was paid over to the receiver in insolvency. *Held*, that petitioner's stock, having been separate from any other and paid for, as between him and the insolvents, or any of their creditors except the pledgee, was his property, and that he was entitled to the entire proceeds; none of it having been needed to pay the indebtedness to the pledgee.

[Rights and liabilities of pledgees of corporate stock, see note to Frater v. Old Nat. Bank of Providence, 42 C. C. A. 135.]

2. SAME.

Petitioner directed the insolvents, who were stockbrokers, to sell certain stock for him, and to purchase certain other stock. They sold and delivered the stock through a correspondent firm in Chicago, which credited the proceeds to their account, and they gave petitioner a corresponding credit on their books. They also purchased the desired stock from another broker, but it had not been paid for nor delivered at the time of their failure, and the sale was canceled by the seller. At the time of the failure, and from the time of the sale of the stock, the insolvents owed the Chicago correspondent firm a balance on account, for which the latter held as collateral stocks purchased and carried, and in which customers of the insolvents had an interest. On the failure such stocks were closed out by the pledgee realizing a surplus after paying the account which was turned over to the receiver in insolvency. *Held*, that petitioner had no interest in such fund, and was not entitled to share therein with customers whose stocks produced it, but was merely a general creditor.

In Equity. On exceptions to master's report on claims of Horace B. Corner and Frank S. Harmon.

M. B. & H. H. Johnson, for Corner.

Smith, Taft & Arter, for Harmon.

Kline, Tolles & Goff, H. J. Caldwell, and C. F. Taplin, for opposing claims of Corner and Harmon.

TAYLER, District Judge. This matter is on for hearing on exceptions to the report of the master as to the claims of Horace B. Corner and Frank S. Harmon, against the proceeds arising from the sale of certain stocks held by Finley, Barrel & Co., of Chicago, for the account of Denison, Prior & Co. The facts as found by the master are as follows:

On January 9, 1906, the date of the failure of Denison, Prior & Co., said firm was indebted to Finley, Barrel & Co. in the sum of $146,913.68; the latter firm carrying for Denison, Prior & Co.'s credit the following certificates of stock in pledge to secure such indebtedness: 2,599 shares of the common stock of the American Ship Building Company; 1,885 shares of the preferred stock of the United Boxboard & Paper Company; 70 shares of the common stock of the United Boxboard & Paper Company; 50 shares of the common stock of the Quaker Oats Company—which securities, with the exception of 75 shares of the Boxboard preferred stock, which were delivered free, were on January 10, 1906, sold out, producing the following amounts:

| | |
|---|---:|
| Ship common | $140,655 05 |
| Box preferred | 26,859 38 |
| Box common | 153 13 |
| Quaker Oats common | 7,146 87 |
| Total | $174,814 43 |

That of said sum $1,698.06 was used to purchase 25 shares of Biscuit common stock, which Denison, Prior & Co. had sold short through Finley, Barrel & Co. That this left Denison, Prior & Co. on January 10, 1906, after the sale of all its securities, in Finley, Barrel & Co.'s hands, with a credit balance of $26,211.69. That on January 25, 1906, Finley, Barrel & Co. turned over to T. H. Bushnell, receiver herein, subject to the rights of the various claimants who had served notices on them, the said sum of $26,211.69, which sum is now in said Bushnell's hands to be distributed under the order of the court.

Under the rule found and announced by the referee, said sum, with interest thereon in the sum of $886.35, should be distributed as follows:

| | |
|---|---:|
| A. W. Ruple | $ 3,088 19 |
| F. E. Taplin | 4,749 57 |
| S. H. Robbins | 740 96 |
| H. C. Meyers | 1,394 36 |
| N. M. Hoyt | 406 83 |
| M. P. Moore | 1,418 25 |
| L. M. Powers | 1,460 46 |
| George Reeves | 706 24 |
| E. L. Emmerson | 713 73 |
| J. B. Coffinberry | 162 55 |
| E. G. Krause | 1,427 42 |
| F. A. Arter | 643 94 |
| W. F. Sprague | 2,628 07 |
| A. H. Noah | 1,549 91 |
| J. P. Loomis | 1,235 21 |
| George D. Bates | 160 48 |
| C. H. Honodle | 65 04 |
| Charles Currie | 63 35 |
| I. N. Shively | 82 96 |
| Horace B. Corner | 3,169 48 |
| Total | $25,867 00 |

To this distribution all parties acquiesce, except Horace B. Corner, and Frank S. Harmon. Said Harmon was denied by the referee any participation whatever in said funds, and the said Corner was denied the preference which he claimed over the other owners of said securities, the reasons for said holdings being set forth at length in the opinion of said referee, which is hereto annexed, and marked "Exhibit A." The said Corner claims that he should be paid in full for his claim $7,146.87.

If the claim of Mr. Corner is allowed, and that of Mr. Harmon is denied, then distribution is to be made, as all parties agree, as follows, to wit: Pay to Mr. Corner the full amount of his claim, deduct the same from the total sum to be distributed, and divide the remainder among the claimants upon the same rule of distribution as above.

If Mr. Harmon's claim is allowed, then distribution is to be made upon the same rule of distribution as above, but including Mr. Harmon.

The facts upon which the rights of Mr. Corner are to be determined are as follows:

On the 24th day of November, 1905, Horace B. Corner placed an order with Denison, Prior & Co. for 50 shares of the common stock of the Quaker Oats Company. That pursuant to said order Denison, Prior & Co. did, on the same day, November 24, 1905, purchase through Finley, Barrel & Co., of Chicago, 50 shares of Quaker Oats stock for Mr. Corner; Finley, Barrel & Co. advancing, in accordance with the usual custom, the purchase price thereof, and charging the same to Denison, Prior & Co.'s general account, retaining the stock in pledge for the indebtedness then created on account of Denison, Prior & Co. with Finley, Barrel & Co. That on the 27th day of November, 1905, Denison, Prior & Co. presented to Mr. Corner a bill for the purchase price of said stock, including commissions, amounting to $6,631.25, and stated that said stock had been purchased for him in Chicago. Mr. Corner thereupon paid said bill, and instructed Denison, Prior & Co. to have the certificate for the said stock transferred for him, and this Denison, Prior & Co. agreed to do, and receipted said bill as follows: "Received payment, Nov. 27, 1905. Denison, Prior & Co., per W. W. Heron, Cashier. Stock deliverable when issued."

A few days thereafter, not having received the certificate, Mr. Corner asked Denison, Prior & Co. about the matter, and they informed him that the certificate had not been received, but that they would deliver it in a few days, as soon as it was received from the transfer office. Nothing more was done by Mr. Corner until the time of the suspension of the firm of Denison, Prior & Co., and the certificate was not delivered to him. Denison, Prior & Co. had never notified their correspondents, Finley, Barrel & Co., to transfer said stock to Mr. Corner.

The custom of brokers is that, when an order is filed for a cash purchase in the Cleveland office, it is wired to the correspondent (in this case Finley, Barrel & Co., of Chicago), who would make the purchase for the general account of the local broker (i. e., Denison, Prior & Co.) charging to the local broker the purchase price, and crediting them with the stock so purchased for their account, retaining the stock so purchased as security for the indebtedness created by the purchase of the stock. As requested by the customer, the stock may be either ordered for delivery in the certificates received by the correspondent, or in the name furnished by the customer. The certificates are then sent to the local broker, being charged to the local broker's account by the correspondent, and then delivered to the customer. The local broker must keep his account with the correspondent at or above a certain credit balance by sending stocks for sale or by cash remittances. Both the above methods have been followed by Denison, Prior & Co.

After the purchase of this stock for Mr. Corner, and after the payment by Mr. Corner to Denison, Prior & Co. for said stock, Denison, Prior & Co. continued buying and selling stocks through Finley, Barrel & Co. in the manner above stated. After the payment by Mr. Corner as above, Denison, Prior & Co. paid to Finley, Barrel & Co., or were credited upon deliveries of stocks to the amount of $13,071.95, and during the same period charges were made against Denison, Prior & Co. by Finley, Barrel & Co. to the amount of $29,300; such debits and credits being made partially on account of purchases and sales

for parties appearing in this matter, and partially for parties not appearing, and all of said debits and credits being made upon the general account.

The custom of brokers in dealing with correspondent brokers in the purchase of stock fully paid for by the local broker's customer, or of stock purchased to be carried on margin account for the customer, is the same. It appears that it is the general custom of brokers to pledge for their own account securities which were either purchased for a margin customer, or deposited by a margin customer to secure his account; and also to pledge with the correspondent broker securities purchased by a local broker for a customer through a correspondent broker until payment had been made to the local broker by the customer. It is, not, however, customary to permit such securities to remain in pledge with the correspondent broker after such payment. They should be redeemed from such pledge by the local broker.

At the time of the failure of Denison, Prior & Co., and for some time prior thereto, said firm was short of margins with Finley, Barrel & Co., namely, the difference between the value of the securities carried for Denison, Prior & Co., and the debit balance of Denison, Prior & Co., was not equal to the customary margin for carrying the stocks then being carried.

The 50 shares of Quaker Oats stock which had been purchased for Mr. Corner through Finley, Barrel & Co. were on hand at Finley, Barrel & Co.'s continuously from the time of said purchase until the time of the sale, and were sold for $7,146.87. Mr. Corner did not consent to, and had no knowledge of, this stock being left in the possession of Finley, Barrel & Co.

It further appears that Mr. Corner was not at any time subsequent to the payment for this stock indebted to Denison, Prior & Co. in any sum whatsoever. The other securities held by Finley, Barrel & Co. were being carried by Denison, Prior & Co. for customers who had either pledged the same to Denison, Prior & Co. as collateral for the purchase of certain stocks on margins, or had purchased such securities on marginal contracts, and that all claimants interested in said securities, with the exception of Mr. Corner, were before the failure indebted to Denison, Prior & Co. to a greater or less extent, but that, after the failure and the closing of their accounts by the sale of their securities, all such other claimants were creditors of said firm.

As to the claim made by Frank S. Harmon, the referee finds that on January 4, 1906, Frank S. Harmon, intervener herein, ordered Denison, Prior & Co. to sell for him 20 shares of the preferred stock of the Quaker Oats Company, and at the same time ordered said firm to purchase for him 25 shares of the Guardian Savings & Trust Company stock. That on said date said firm executed both orders in the following manner: By selling the 20 shares of Quaker Oats preferred stock on the Chicago Stock Exchange for $103 per share, realizing a net amount, after deducting commissions, of $2,057.50; said sale being made through the Chicago brokerage house of Finley, Barrel & Co. That the purchase of the 25 shares of Guardian Savings & Trust Company stock was made at $302 per share, which, with the commission added, made a gross amount of $7,556.25; said purchase being made on the Cleveland Stock Exchange from the firm of Wright, McLeod & Baker, members of said exchange. That both of said transactions were reported in writing to said Harmon, and on January 5th said Harmon delivered to Denison, Prior & Co. a certificate for 20 shares of the preferred stock of the Quaker Oats Company, and at the same time paid Denison, Prior & Co. the sum of $98.75, which sum, together with the proceeds of the sale of the Quaker Oats stock, he directed to be applied on the purchase price of the Guardian Savings & Trust Company stock, thus leaving a balance due Denison, Prior & Co. of $5,400, and it was then agreed that Denison, Prior & Co. should deliver said shares of Guardian Savings & Trust Company stock to the Citizens' Savings & Trust Company, with which company Harmon had an arrangement whereby the bank would pay the balance of $5,400 to Denison, Prior & Co. on the delivery of said Guardian Savings & Trust Company stock.

Upon the sale of the Quaker Oats stock on January 4th, Finley Barrel & Co. credited Denison, Prior & Co.'s account with the selling price thereof, and charged their account with the stock so sold. That Denison, Prior & Co. transmitted the certificate of Quaker Oats preferred stock so delivered to it by Harmon to Finley, Barrel & Co. in Chicago, which firm, upon receipt of said

certificate on January 9th, credited Denison, Prior & Co.'s account with the stock so received, making a net credit on account of the transaction of $2,-057.50.

On the 9th of January the books of Denison, Prior & Co. showed Harmon to be owing said firm the sum of $5,400, and that the firm were carrying for his account 25 shares of Guardian Savings & Trust Company stock; that Denison, Prior & Co. did not pay Wright, McLeod & Baker any part of the purchase price of the 25 shares of Guardian Savings & Trust Company stock, and at the suspension of Denison, Prior & Co. on January 10, 1906, said shares of stock were still in the possession of Wright, McLeod & Baker, and were held by said firm subject to the rules of the Cleveland Stock Exchange, which provide that, on suspension of a member of the exchange, the sale could be closed out and any deficiency resulting therefrom should be a lien on the seat of the firm so becoming insolvent; that, instead of closing out said sale, the same was canceled, and no loss resulted to Denison, Prior & Co., and no charge was made against the seat of said firm on the Cleveland Stock Exchange.

In closing out Mr. Harmon's account, Denison, Prior & Co.'s books credited him with the sum of $7,556.25, leaving Mr. Harmon with a net credit of $2,-156.25.

\* \* \* \* \* \* \* \* \* \*

It further appears that the credit balance in the possession of Finley, Barrel & Co. was insufficient to pay to the customers of Denison, Prior & Co. the amount of their interest in the securities held by Finley, Barrel & Co. as collateral to their account with Denison, Prior & Co.; that is, Denison, Prior & Co. had pledged said securities with Finley, Barrel & Co. for a greater sum than the securities had been pledged by the customers with Denison, Prior & Co.

As to the claim of Horace B. Corner:

Reduced to its simplest form these are the facts in the Corner case: November 24, 1905, he gave an order to Denison, Prior & Co. to purchase for him 50 shares of Quaker Oats stock. This order was telegraphed to Finley, Barrel & Co. at Chicago, and on the same day the purchase was made by that firm. Certificates for the stock were taken by it in completion of the purchase, and the same were held, as by custom it had a right to do, as security on the general account of Denison, Prior & Co. Within a day or two a bill was rendered to Corner by Denison, Prior & Co. for $6,631.25, being the price of the stock and commissions, which was thereupon paid. At the time payment was made Denison, Prior & Co. were instructed by Corner to have the certificate for the stock transferred to him, and this they agreed to do. A few days later Corner again requested delivery of the certificate, and was informed that it had not been received, but that they would deliver it in a few days when received from the transfer office.

All this time the certificate or certificates for the 50 shares purchased for Corner and paid for by him remained in the hands of Finley, Barrel & Co., and continued to remain there until the failure of Denison, Prior & Co. When that occurred, there were other shares of stock in other companies in the possession of Finley, Barrel & Co. bought for account of Denison, Prior & Co., in which no person had a certain separable and distinguishable interest, but which belonged to several persons whose separate interests could not be determined. All the stocks were sold and the proceeds, after settling the indebtedness of Denison, Prior & Co. to Finley, Barrel & Co., are here for distribution. The Quaker Oats stock sold for $7,146.87, and the gross sur-

plus for distribution is $26,211.69. The master held that Corner had no prior claim to the Quaker Oats stock, but that he must be content to share ratably with the other persons interested in the surplus arising after the settlement of Finley, Barrel & Co.'s account.

Confusion is likely to arise if we do not bear in mind the fact that Finley, Barrel & Co. may have precisely the same rights in all of the Denison, Prior & Co. stocks in their hands, although Denison, Prior & Co. may, as between themselves and their customers, sustain a very different relation to the same stocks.

So far as the questions before us are concerned, the relative rights of the claimants to the surplus are to be determined by their relations to Denison, Prior & Co. Bearing this in mind, and bearing in mind the custom of brokerage transactions, we have here simply a question wherein, subject only to the rights of the pledgee, we follow the trust property, if we can; and if it may be identified and followed and reached, it must necessarily pass in some form or other into the hands of its owner. We do not resort to a plan of ratable distribution of the proceeds of the sale of the trust property, except where, as among the several owners of the trust property, we are unable to distinguish one part of the trust property from another as being the property of one of the beneficiaries.

If, as between a claimant and Denison, Prior & Co., the stock was wrongfully in the possession of Finley, Barrel & Co., then such a claimant is, in the event of a surplus, in a better position than those claimants, as between whom and Denison, Prior & Co., the stock was rightfully in the possession of Finley, Barrel & Co. This, it seems to me, is equity, and the law is not powerless to declare and enforce it.

The relation of Corner to the transaction itself and to Denison, Prior & Co. is radically to be distinguished from that which arose between margin traders and Denison, Prior & Co. Corner did not become a co-surety with other claimants or margin traders. The very ingenious and plausible illustration of Judge Caldwell, based upon the theory of co-suretyship, fails, for that reason, it seems to me, to be apposite.

As affecting the rights of Corner, the custom of brokerage transactions is unimportant, except as to the right of Finley, Barrel & Co. to hold the stock purchased as collateral to Denison, Prior & Co.'s account. Beyond that the right of the owner of the stock is determined by the general rules of law. These shares were Corner's. They ought to have been taken up by Denison, Prior & Co. Not having been so taken up, Corner's risk was that they might be needed to satisfy the general indebtedness of Denison, Prior & Co. to Finley, Barrel & Co., or that his stock might be indistinguishably mingled with other stocks belonging to persons similarly situated, and any delay on the part of Corner to effectually assert his claim of ownership could have no other effect adverse to him than to increase the risk of being unable to identify his property.

Suppose that Corner had served notice on Finley, Barrel & Co. that he was the owner of the 50 shares of Quaker Oats stock, and the proceeds of the sale of the Quaker Oats stock not being necessary to pay the indebtedness of Denison, Prior & Co. to Finley, Barrel & Co., what would have been the rights of Corner? They are defined

by the case of Le Marchant v. Moore, 150 N. Y. 209, 44 N. E. 770, and, as it seems to me, by the general principles of law and the demands of justice. Save only as subject to the rights of Finley, Barrel & Co., as pledgee, the title had passed to Corner. Only formal transfer was needed to complete the transaction. The trust was, with exact certainty, impressed upon the very shares of stock in the possession of Finley, Barrel & Co., and in order to justify the conclusion that these shares of stock or their proceeds belonged to Corner, we do not need to resort to the modern enlargement of the rule of following a trust fund, as declared in Knatchbull v. Hallett, 13 Ch. D. 696, and Bank v. Insurance Company, 104 U. S. 54, 26 L. Ed. 693.

As between him and the other claimants the points of distinction are: (1) Corner had bought and paid for certain shares of stock; the other claimants had not. (2) Corner's stock could be identified and separated from the mass; that of other claimants could not. (3) As between Corner and Denison, Prior & Co., the latter had no right to leave the stock in pledge; as between other claimants and Denison, Prior & Co., the latter had the right to leave the stock in pledge. The right of Corner is prior, both to his fellow claimants, and to general creditors; the right of his fellow claimants is prior to general creditors. Thus is equity done to all concerned.

It seems to me, therefore, clear that, subject to the rights of Finley, Barrel & Co., Corner was, at the time of the failure of Denison, Prior & Co., entitled to possession of the 50 shares of the Quaker Oats stock, which had been bought for him, and that he is now entitled to the proceeds of the sale of that stock.

As to the claim of Frank S. Harmon:

An analysis of the situation created by the Harmon transaction discloses the relation of creditor and debtor between him and Denison, Prior & Co. It is not a case of trusteeship and cestui que trust. There is no following of property. The fact that the fund in the hands of Finley, Barrel & Co. was increased by the amount of the Harmon claim is the same as if an ordinary transaction had occurred whereby money was paid to Denison, Prior & Co., for the purpose of making a purchase, and no purchase was made. The result therefore, is that Harmon is in the unfortunate position of a contributor to a fund which left him in the real position of a mere creditor, and the utmost claim to be made on his behalf would be that so much of this fund as he contributed should pass into the general estate.

I think the master was right in holding that Harmon has no claim of preference in the balance growing out of the settlement of account between Finley, Barrel & Co. and Denison, Prior & Co.

The exceptions to the finding of the referee as to the claim of Corner are therefore sustained. The exception to his finding as to Harmon is overruled.