### In re MEADOWS, WILLIAMS & CO.

### In re DOUGLAS.

(District Court, W. D. New York. July 29, 1909.)

#### No. 3,040.

1. BANKRUPTCY (§ 140*)—PROPERTY VESTING IN TRUSTEE—STOCKBROKERS—STOCKS BOUGHT FOR CUSTOMER.

Bankrupts, who were stockbrokers in Buffalo, received orders from petitioner to buy certain stocks, which they executed through their New York correspondents, who purchased the stocks, paid for the same, and charged the amount to bankrupts' general account. They subsequently had the stocks transferred and certificates therefor issued in petitioner's name, but retained the same as security for the bankrupt's account. On being advised of the purchase, petitioner paid bankrupts for the stocks:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

but they did not remit the money to the New York brokers, and the stocks had not been delivered when the bankruptcy occurred. Bankrupts' indebtedness to the New York brokers was paid from the proceeds of a seat in the Exchange, on which they had a lien under the rules of the Exchange, and the stocks were delivered to bankrupts' trustee. *Held*, that, on her payment for the stocks, the title vested in petitioner, subject, possibly, to a lien in favor of the New York brokers for the purchase price, and, such price having been paid from other property, on which they also had a lien, she was entitled to the certificates, as between her and the trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

2. BANKRUPTCY (§ 140*)—STOCKBROKERS—TITLE AND RIGHTS OF TRUSTEE.

In such case, the bankrupts having no title to nor lien upon the stock, the trustee took none, but occupies the same relation toward petitioner that the bankrupts did.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In the matter of Meadows, Williams & Co., bankrupts, on review of order of referee denying petition of Alice H. Douglas for delivery to her of certain stocks. Order modified.

Kenefick, Cooke & Mitchell (James McCormick Mitchell, of counsel), for petitioner.

Edward L. Jellinek, for trustee.

HAZEL, District Judge. This is a proceeding on the petition of Alice H. Douglas to reclaim two certificates, of 100 shares each, of preferred stock of the Great Northern Railway Company, which are in the possession of the trustee in bankruptcy herein. The petition was referred to the referee, and a decision rendered, which is the subject of review. The salient facts are as follows:

On June 2 and 17, 1908, the petitioner, by her husband, acting as her agent, purchased 200 shares, in blocks of 100 each, of the capital stock of the Great Northern Railway Company, at 134 and 130½, respectively, through the firm of Meadows, Williams & Co., brokers, at Buffalo, N. Y. On the same days that the stock was ordered, Meadows, Williams & Co. in writing notified the petitioner that the purchases had been made on her account. On July 22d, petitioner notified Meadows, Williams & Co. that she would take up the stocks later. On July 31st, she paid them in cash therefor the sum of $26,698.26, which was the amount stated by said firm to be due on account of such purchases. At the time of such payment, and frequently thereafter between the 2d and 24th days of August, the petitioner demanded delivery of the stock from Meadows, Williams & Co.; but they informed her that it was being transferred on the books of the Great Northern Railway Company, and the certificates would be delivered to her as soon as the transfer was completed. At each time the blocks of stock were ordered to be purchased Meadows, Williams & Co. transmitted said order by wire to their correspondents, Post & Flagg, of New York City, stockbrokers with whom they had an account, requesting them to purchase the preferred stock, which they did at the figures quoted. When the purchases were completed, Post & Flagg so wired Meadows, Williams & Co., who notified the petitioner thereof. The

said stock was held by Post & Flagg as collateral security for the pay-- ment of the debts and obligations of Meadows, Williams & Co. and as a margin in their account. On August 1st the bankrupts credited the petitioner with a quarterly dividend on said stock. On August 17th, Post & Flagg, in response to a telegram from Meadows, Williams & Co. requesting them to have the 200 shares of stock transferred to the petitioner and forward it to them, declined so to do, on the ground that the balance of account of Meadows, Williams & Co. did not cover the value of the stock; but subsequently, on August 19th, at the request of Meadows, Williams & Co., the said firm did cause the specified stock to be transferred to Mrs. Douglas on the books of the railway company, and forwarded the certificates to the Bank of Buffalo, with draft on Meadows, Williams & Co. for $27,812.50 attached. The draft was not paid on presentation, and it was returned with the stock to the drawers. On August 20th the husband of the petitioner, in response to a request for the stock, received a letter from Meadows, Williams & Co. explaining that the stock owned by Mrs. Douglas was then in Buffalo, but because of financial complications they were compelled to defer delivery to her. At all times the petitioner was ignorant of the fact that the stock had not been transferred to her, or that Post & Flagg were holding it in their hands as security for its purchase price, or as collateral security for any indebtedness of the bankrupts. On August 24th Meadows, Williams & Co., as individuals and copartners, were adjudged bankrupts, and a trustee was elected by the creditors, who qualified and entered upon the discharge of his duties. In November, 1908, the indebtedness of the bankrupts to Post & Flagg, including the purchase price of the stock in question, was fully paid and satisfied out of the proceeds of the sale of a membership seat in the New York Stock Exchange owned or controlled by Meadows, Williams & Co. It is shown that Post & Flagg, who were also members of the New York Stock Exchange, had a lien upon the said seat or membership privilege, and that the sale was had upon their application to the governors of the Stock Exchange, with the assent of the trustee, to satisfy their lien or claim against the bankrupts. The seat netted $64,000, out of which sum Post & Flagg, in satisfaction of their lien and indebtedness, received $46,091.98; the remainder, after payment of certain obligations to other members of the Stock Exchange, amounting to $7,473.57, being turned over to the trustee, to whom, also, Post & Flagg delivered the 200 shares of stock in question.

The primal question is whether the petitioner was the owner of the 200 shares of stock at the time of the bankruptcy. The transaction was the usual one of buying stock in an interior city, first on margin, and then directly for delivery, through a stockbroker, who consummated the purchase by wire through another stockbroker carrying on business in New York City. They regarded the transaction as one between themselves, in which the purchase price would seasonably be covered either in cash or collateral security. It is well settled that the right of ownership of stock does not depend upon the precise method of payment or the customary course of business between stockbrokers. In the present case the petitioner paid the broker, with whom she

initiated the transaction, in full for the stock, and relied upon them to faithfully consummate the agreement. The stock was issued to her, and she was entitled to its immediate delivery, subject, perhaps, only to the equitable right of Post & Flagg to be reimbursed for their advances in purchasing it. It was not essential that the bankrupts, acting as the agents for the petitioner, should personally buy the stock. If, however, they had bought it personally, and caused it to be issued in the name of Mrs. Douglas, she was, upon payment, entitled to its possession. That the stock was bought through Post & Flagg does not alter the relations of the parties, except, perhaps, they might, if without sufficient collateral, claim a lien upon the stock purchased.

Counsel for the trustee concedes that, when shares of stock are bought on margin, the title vests in the customer; the broker having the legal right to retain its possession in pledge for the purchase price. This rule is not thought essentially different in a case where the stock is bought direct, or for delivery, and absolved from the complications of speculation. There would almost seem to be better reason for the applicability to a straight purchase, where the stock is to be delivered, of the rule which counsel for the trustee concedes applies to a margin transaction. From the facts herein, Post & Flagg must be deemed to have bought the stock, relying upon the obligation and ability of Meadows, Williams & Co. to pay the sales price. They had the option of refusing to buy the stock until the price therefor was fully paid; but, instead of so doing they completed the transaction, and subsequently recognized the petitioner's claim of ownership of the stock. Le Marchant v. Moore, 150 N. Y. 209, 44 N. E. 770.

In Denison v. Emery (C. C.) 153 Fed. 127, Corner gave an order to Denison, Prior & Co. for 50 shares of Quaker Oats stock, which order was wired to their Chicago correspondents, Finley, Barrel & Co., by whom the purchase was made. The purchasing brokers did not deliver the stock, but held it as collateral security for the general account of Denison, Prior & Co. Corner afterwards paid Denison, Prior & Co. in full for the stock and demanded a transfer thereof to him; but it was not transferred, although they frequently promised to do so. Possession of the Quaker Oats stock, together with other stocks belonging to different persons, bought on account of Denison, Prior & Co., continued in the purchasing brokers up to the time of the failure of Denison, Prior & Co. Thereafter all the stocks so held as collateral were sold by Finley, Barrel & Co., and the proceeds applied to the indebtedness to them of Denison, Prior & Co. The court, overruling the master, decided that, as the Corner stock was in the possession of the purchasing brokers, was traceable, and could be separated from other stock, and as it had been paid for as between him and other creditors, except the pledgee, he was entitled to the stock—that it was his property. The Circuit Court of Appeals, affirming the District Court, sub nom. Harmon v. Sprague, 163 Fed. 486, 90 C. C. A. 32, said:

"The stock was bought on the order of the Cleveland brokers, by the Chicago firm, for Corner, and was paid for by him; the bill being sent him by the Cleveland firm. When this was done, the stock belonged to Corner, and the certificate should have been sent him; but the Cleveland firm failed to

do so, and as a result the stock was sold, upon their failure, as collateral, to satisfy the account of the Chicago brokers against them. We think this was done wrongfully. Corner owed neither the Cleveland firm nor the Chicago brokers anything, and consequently the proceeds of Corner's stock, which went into the funds at the sale, should go to him."

This holding, in which I concur, may be paraphrased upon the facts of this case. See, also, In re Bolling (D. C.) 147 Fed. 786, affirmed Kean v. Dickinson, 152 Fed. 1022, 82 C. C. A. 667; In re Graff (D. C.) 117 Fed. 343.

The referee was of the opinion, inter alia, that if Post & Flagg had continuously carried the stock from the time it was first purchased to the date of the bankruptcy, and had sold it with other securities pledged with them, the claim of the petitioner to the surplus, if any, would have been superior to that of the trustee; but in his opinion, as the purchase price of the stock was actually paid out of the proceeds of the sale of the seat in the Stock Exchange, an asset of the bankrupts. the petitioner would have been in no different position than any other customer of Meadows, Williams & Co., if their stock held as collateral had been sold by Post & Flagg. I am unable to agree with this conclusion. It makes no difference that the 200 shares of stock were not continuously in the possession of Post & Flagg from June 2d to August 24th. It is enough that Post & Flagg bought the number of shares ordered for the petitioner through her brokers, and caused them to be transferred to her on the books of the Great Northern Railway Company on the 19th day of August, prior to the filing of the petition in bankruptcy. Whatever jobbing there was in these shares were dealings between the brokers, and the petitioner was ignorant of them. Post & Flagg had the lawful right to satisfy their claim out of the proceeds of sale of the seat in the Stock Exchange. Hyde v. Woods, 94 U. S. 523, 24 L. Ed. 264; Weston v. Ives, 97 N. Y. 222. While, true enough, the seat was an asset of the bankrupts, yet it was incumbered by a lien; i. e. their indebtedness to their associate members in the Stock Exchange, which included the purchase price of the stock in question. Prior to the filing of the petition in bankruptcy Meadows, Williams & Co. could not have made a valid disposition of the 200 shares of stock, nor could the same have been levied upon or seized under judicial process against them. The legal title was not in them, and upon receiving payment for the stock their interest as pledgee was extinguished. Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835; Le Marchant v. Moore, supra; Skiff v. Stoddard, 63 Conn. 198, 26 Atl. 874, 28 Atl. 104, 21 L. R. A. 102. The relation of the trustee to the stock is in no sense dissimilar to that of the bankrupts. By his election he obtained no right or title to the stock, and the authorities uniformly hold that a trustee occupies the same relation to the creditors that the bankrupt sustained prior to the inception of the proceedings. In re Kellogg (D. C.) 112 Fed. 52; affirmed sub nom. Hewitt v. Berlin Machine Works, 194 U. S. 298, 24 Sup. Ct. 690, 48 L. Ed. 986.

If, then, we consider the trustee in the shoes of the bankrupts, how can he, for the bankrupts, insist on retaining the stock when the petitioner paid for it, and, moreover, when the bankrupts themselves, be-

fore their adjudication, declared that she owned it, that it was bought for her, and when the stock, though in the possession of the purchasing stockbroker, was traceable and set apart from other stocks in which the bankrupts were interested. The legal title did not vest in the trustee, and as to whether an equitable interest may be impressed upon the stock, in view of the situation, is a question not here for decision. If the purchasing brokers had an equitable lien, there certainly is merit in the contention that they relinquished it. They elected to look for payment of their advances to their claim against the seat in the Stock Exchange, which certainly, by analogy, if not in fact, operated as a valid lien for the indebtedness pro tanto of the bankrupts.

The referee held that the petitioner had a prior right to the general creditors to 60 shares only of the stock now in the possession of the trustee; but the exceptions filed to his conclusions must be sustained, and his decision modified to conform hereto.

So ordered.

