HARRY E. PARSONS, PLAINTIFF, v. THIRD NATIONAL COMPANY, A CORPORATION, DEFENDANT; WALTER F. FAUST, RECEIVER OF FIRST NATIONAL Co., APPELLANT; BRIGGS A. HOFFMANN, CLAIMANT, RESPONDENT.—94 S. W. (2d) 1057.

St. Louis Court of Appeals. Opinion filed June 2, 1936.

*Milton F. Napier* for appellant.

*Cobbs & Logan* for respondent.

HOSTETTER, J.—The controversy in this case followed the granting of a receivership for the Third National Company, a brokerage concern, incorporated in Missouri, its office being located in the city of St. Louis. One Tom Wells had been its manager and ruling spirit up to the time of his death. Thereafter its sales manager, Harry E. Parsons, filed his petition, on the 30th day of July, 1934, in the Circuit Court of the City of St. Louis, asking *inter alia*, for the appointment of a receiver for said corporation, which, after a hearing, was granted and Walter F. Faust (appellant in this court) was appointed receiver and duly qualified as such on August 6, 1934.

On August 31, 1934, Briggs A. Hoffmann (respondent in this court) filed in said circuit court his application for an order requiring said receiver to turn over and deliver to him 100 shares of stock in the Radio Corporation of America. The making of such order was resisted by the receiver and, after a hearing, the trial court on December 3, 1934, found in favor of the claimant, Briggs A. Hoffmann, and ordered the receiver, William A Faust, to deliver said 100 shares of stock in controversy to said claimant. Thereupon, the said receiver, after his motion for a rehearing was overruled, duly perfected his appeal to this court.

The facts are substantially as follows:

On May 28, 1934, respondent, through his friend, Harry E. Parsons, sales manager of the Third National Company, opened an account with it for the purpose of purchasing 100 shares of Radio stock, which was then selling at $7.25 per share, by giving the company his check for $500, which was subsequently paid, and delivering certain other shares of stock, which subsequently were sold for $85.66, and, on July 21, 1934, he gave another check for $148.15, all of which aggregated $733.81, in full payment for the purchase price of the stock plus commission and interest, and demanded delivery of the stock. He was advised by Parsons that it would be around ten days before the Radio stock could be delivered as it would require time to secure transfer and delivery from New York.

On July 27, 1934, he mailed a letter to his friend Parsons, in care of the Third National Company, reading as follows:

"As I am leaving the 29th on my vacation, I would appreciate an acknowledgment from you for the check in the amount of $148.15, also advise me when I may expect the 100 shares of Radio stock."

Newhard, Cook and Company, a St. Louis Brokerage House, on July 24, 1934, received instructions from the Third National Company to have 100 shares of Radio stock issued in the name of Briggs A. Hoffmann, which transfer instructions were accompanied by a check of the Third National Company for $1200 payable to Newhard,

Cook & Company, or their New York correspondent, Charles D. Barney & Company, in order to make possible the delivery of the 100 shares of Radio stock. The transfer instructions reached Charles D. Barney & Company, the New York correspondent, on July 24, 1934, and the stock was duly transferred on July 27, 1934, represented by Certificate No. N-262056, of the Radio Corporation of America for 100 shares of common stock in the name of Briggs A. Hoffmann. This certificate was sent to Newhard, Cook & Company and was received by that firm on July 30, 1934, on the very day the receivership was applied for, and the Third National Company's office was closed, and Newhard, Cook & Company held the certificate until after August 6, 1934, when, upon demand being made for it by the receiver, it was delivered to him, his receipt for it being as of August 1, 1934.

It clearly appears that all of the dealing between the Third National Company and respondent Hoffmann had been completed and the issuance of the 100 shares of stock in the latter's name was an accomplished fact some days prior to the filing of the application for a receivership, and that the transferred stock never came into the possession of the Third National Company. The evidence disclosed that the Third National Company was not a member of any New York stock exchange. It did business in the purchase and sale of securities for its customers on the New York Exchange through Newhard, Cook & Company, and A. G. Edwards & Sons, both brokers located in St. Louis, Missouri. Although a member of the firm of Newhard, Cook & Company is a member of the New York Stock Exchange, its orders were executed through the New York office of Charles D. Barney & Company, their New York correspondent. The customary course of dealing between these companies, which is similar to all stock brokerage transactions, was that in the event a customer of the Third National Company desired to purchase stock on margin, the Third National Company would accept the customer's order and his marginal payment. Subsequently, it would have Newhard, Cook & Company, or A. G. Edwards & Sons purchase the stock, the purchase being made on account of the Third National Company. If the order were made through Newhard, Cook & Company and the Third National Company did not pay for the stock in full, the stock would be held in New York by Charles D. Barney & Company as collateral for the Third National Company's account. The stock in New York would be purchased in the "street name" of the representative of Charles D. Barney & Company and so held until transfer instructions were delivered by the Third National Company to Newhard, Cook & Company in St. Louis and forwarded by the latter to New York. The transfer instructions would be accompanied by either additional stock to take the place of the collateral thus being delivered, or by additional funds in order that the Third

National Company's account would have the proper marginal requirement to permit delivery. At the time of the transfer instructions, the name of the customer of the Third National Company would: first appear in the transaction as between the brokers.

Under the custom prevailing between brokers in this type of transaction, when the customer's account was paid in full and the stock was to be delivered, any Radio stock in the account of the Third National Company at that issue, whenever purchased, after the indebtedness of the Third National Company against it was paid, might be used to fulfill the customer's order.

Extracts from the testimony of Grove Newhard, a member of the brokerage firm of Newhard, Cook & Company, he being also an individual member of the New York Stock Exchange, and from the testimony of Clifford Hause, auditor for Francis Brothers, may serve to illuminate the methods in vogue in respect to such dealing between brokers, viz.:

*From Grove Newhard's Testimony. Cross-Examination.*

"Q. And all purchases made by the Third National Company were credited to the general account of the Third National Company? A. That is right.

"Q. And all purchases of stock were retained, either by Newhard, Cook & Company or Barney & Company as collateral on its margin account? A. That is right.

"Q. So, in any event, if Briggs Hoffmann bought 100 shares of Radio for his account through the Third National Company, you would not know of it? A. Not unless they gave us transfer instructions.

"Q. Because, if you got (transfer) orders for 100 shares of stock, you would take any 100 shares you had in the street name and send it on in the name of Briggs A. Hoffmann. (Parenthesis ours.) A. Yes, sir."

Questions by the Court:

"Q. Their marginal account would protect you on purchases they made from you? A. Yes, sir; they owed us part of the amount due on the purchases we made, and we held the securities they purchased from us as collateral.

"Q. Now this slip, Exhibit No. 7, is in substance a request for you, from the Third National Company, to order out of their collateral up with your firm, 100 shares of Radio to Briggs A. Hoffmann? A. In his name and deliver to them.

"Q. And what you did was to write Charles D. Barney & Company to have that 100 shares transferred to the name of Briggs A. Hoffmann? A. That is right.

"Q. And you credited the Third National Company with $1,200.00 on general account? A. That is right.

"Q. And the $1200.00 check is the check you spoke of a while ago,

which was sent over at the same time the slip was sent over by that girl messenger? A. That is right.

"Q. That would take care of the seven hundred odd dollars applied for the Radio 100 shares; is that right? A. Yes, that is right."

*From Clifford Hause's testimony. Recross Examination.*

"Q. I am talking about Mr. Hoffmann. A. The Third National Company would not set the stock aside, and Barney & Company would not know Mr. Hoffmann until it is paid for.

"Q. And when it is ordered out, they will use any 100 shares of Radio which they have? A. Yes, sir, that is in the Third National account.

"Q. And that may have been bought in the Third National account? A. Yes, sir."

It was also testified by the witness Clifford Hause, an auditor who went over the Third National Company's affairs for the receiver, a man experienced in stock brokerage audits, that it would be possible for the selling broker to deliver to his customers stock ordered from any brokerage house in which the purchasing broker had an account; that is, it was not necessary to deliver the stock from the same brokerage house through which the original purchase order for the customer was made.

Mr. Hause also testified that the Third National Company kept no systematic record of their purchase and selling orders. From the records on hand, he attempted to match up all buying and selling orders made by the Third National Company with the customer's accounts. Because of the condition of the records, he could not say that all buying and selling orders made by the Third National Company for their customers were preserved by the Third National Company and in the offices of the company at the time of the receivership. He stated he could find no buying order for the respondent. However, he did find that the Third National Company purchased 100 shares of Radio stock at $7.25 per share on June 4, 1934, through A. G. Edwards & Sons and also a similar lot through the same brokers on June 5 at $7.00 per share, that there were no purchase orders to match these shares, and that the estate was still "long" these shares.

"THE COURT: What became of the 100 shares of Radio bought June 4 and the like 100 shares bought June 5? A. They are still 'long' with Edwards & Company."

The auditor, as above stated, testified that a broker such as the Third National Company, might deliver to a customer from a different house than the one through which the original purchase was made.

"Q. And, might I ask, could it have been delivered from a different house from which they bought? A. It could have been, but it would not be the practice."

The auditor also testified that the Third National Company had

received orders for the purchase of some 4,300 shares of Radio Corporation stock, that is, its customers were "long" in this stock to that extent; that the brokerage houses through which the Third National Company was dealing only had 2,210 shares of Radio stock at the time of receivership which was being held as security for the Third National account with these brokerage houses in accordance with their custom of dealing.

Appellant claims error on the ground that the effect of the ruling of the trial court is to permit respondent to have an unlawful preference over other customers who are creditors; that the stock awarded to respondent was paid for by other customers and that respondent has failed to trace his money into the purchase of the particular certificate of 100 shares of Radio common awarded to him by the trial court.

Appellant as receiver of the Third National Company acquires no rights greater than those of the estate to which he has succeeded and must recognize liens and equities existing at the time of the receivership. Therefore, unless the Third National Company, if functioning as a going concern, could have prevailed, neither can its receiver. [Craig v. Stacy et al., 330 Mo. 569, 50 S. W. (2d) 104, l. c. 106; Clark: Receivers (Vol. 1, 2d Ed., secs. 354, 362.]

Clark on Receivers, supra, states this well recognized doctrine in the following language, viz.:

"A receiver takes possession of the property or the title to the property, as some of the cases say, subject to all the liens and equities which existed at the time it is taken over by the receiver. He does not take over any more title than the person, firm or corporation had. . . . As a general rule of law, a receiver possesses no rights with respect to the property in his possession superior to those which would be possessed by the defendant, individual or corporation whose property was thrown into the hands of the court."

It is asserted by counsel that the relationship existing between a stockbroker and his customer, whether the latter has purchased the stock outright by making full payment for same, or whether he is purchasing it on margin, has never been before the courts of last resort in Missouri in such a manner as to require a judicial determination of such relationship. Our investigation confirms the correctness of this assertion. So we are compelled to rely on foreign authorities as an aid in reaching a correct and satisfactory conclusion in the instant case.

The New York courts, where such questions arise most frequently, have announced and adhered to the rule that such relationship between a customer and his stockbroker is that of pledgor and pledgee, whether the stock is purchased outright or on margin, recognizing, however, that it is not the ordinary common law pledgor-pledgee relationship as it lacks certain elements of the ordinary pledge, but

holding that these differences are not important or controlling inasmuch as they arise out of the peculiarities of the business and the nature of the commodities dealt in. The relationship between a stockbroker and his customer differs from the ordinary common law pledge in these respects:

At the time of the creation of the relationship, there is no identifiable pledge *"res."* In fact, none may exist until the stock is ordered out for delivery. This difference is not controlling because it is recognized that the customer does not expect delivery of any particular shares of stock of the corporate issue traded in. It is recognized that each share of stock of a particular issue of a corporation is identical with any other share of the same issue. The customer, accordingly, gets what he bargains for so long as he receives the requisite number of shares of the particular issue of the corporation dealt it.

This identity of kind is aptly stated by the U. S. Supreme Court in the case of Richardson v. Shaw, 209 U. S. 365, 52 L. Ed. 835, 1. c. 842:

"A certificate of the same number of shares, although printed upon different paper and bearing a different number, represents precisely the same kind and value of property as does another certificate for a like number of shares of stock in the same corporation.

"It is a misconception of the nature of the certificate to say that a return of a different certificate or the right to substitute one certificate for another is a material change in the property right held by the broker for the customer."

It is also recognized from the very nature of the business that when a customer delivers to a broker the sufficient marginal requirement to purchase stock the broker will necessarily use his own funds or credit to make up the difference between the margin given by the customer and the market price of the stock. Also, because of the nature of the stock it is not incumbent upon the broker to purchase any identical shares for his customer; he may make delivery out of stock purchased prior or subsequent to the customer's order or even out of the broker's own portfolio.

In Sexton v. Kessler & Co., 225 U. S. 90, 1. c. 97, 56 L. Ed. 995, 1. c. 1000, the court, speaking through Mr. Justice HOLMES, used this language, viz.:

"When a broker agrees to carry stock for a customer, he may buy stocks to fill several orders in a lump; he may increase his single purchase by stock of the same kind that he wants for himself; he may pledge the whole block thus purchased for what sum he likes, or deliver it all in satisfaction of later orders, and he may satisfy the earlier customer with any stock that he has on hand or that he buys when the time for delivery comes."

For example, where a customer orders his broker to buy say, 100

shares of U. S. Steel common, at a time when the selling price is $50 per share and the purchaser puts up with his broker fifty per cent, or $2500, the broker furnishing the remainder of the purchase price, $2500, there is also injected into the transaction a debtor-creditor relationship as to the $2500 furnished by the broker, which exists along with the pledgor-pledgee relationship.

In Richardson v. Shaw, 209 U. S. 365, 52 L. Ed. 835, the court says:

" 'Upon the whole, while it must be conceded that there are apparently some incongruous features in the relation, there seems to be neither difficulty nor hardship in holding that a stockbroker is a pledgee; for although it is true that he may advance all or the greater part of the money embraced in the speculation, if he acts honestly, faithfully, and prudently, the entire risk is upon the client.'

"The rule thus established by the courts of the state where such transactions are the most numerous and which has long been adopted and generally followed as a settled rule of law, should not be lightly disturbed, . . .

"We reach the conclusion, therefore, that, although the broker may not be strictly a pledgee, as understood at common law, he is essentially a pledgee, and not the owner of the stock, . . ." [See also Sexton v. Kessler & Co., supra; Duel v. Hollins, 241 U. S. 523, 60 L. Ed. 1143, 1. c. 1146.]

The case of Richardson v. Shaw, supra, furnishes an effective answer to the contention urged by the appellant in the instant case, which contention is that the delivery of the 100 shares of Radio to respondent would constitute an unlawful preference as to claims of other customers who were creditors of the Third National Company. The U. S. Supreme Court in the Richardson case, supra, decided this point adversely to the contention of appellant in the instant case.

The certificate of 100 shares of Radio was made out in respondent's name and duly numbered and transferred, so that it was rendered capable of identification, all of which was done prior to the receivership. Capability of identification is an important factor in justifying reclamation. In In re J. C. Wilson & Co., 252 Fed. 631, 1. c. 653, the court said:

"Where, by reason of conversion, less shares of a certain stock are found 'in the box' than are necessary to satisfy the claims of 'long' customers, the procedure is first to trace. If a claimant identifies his stock by certificate number, etc., he is entitled to reclaim that stock or its proceeds. After such specifically identified shares are withdrawn from the total of shares, the remaining claims will be prorated under Duel v. Hollins, supra."

To the same effect has the doctrine been affirmed in Sexton v. American Trust Company, 45 Fed. (2d) 372, 1. c. 379, decided by the U. S. Circuit Court of Appeals in Eighth Judicial Circuit, the court using the following language, viz.:

"In a contest between claimants as to a particular kind of stock, if a claimant identifies his stock, as Sexton does here, by certain numbers, he would be entitled to a preference over the owners of the same kind of stock in any particular class who could not make such identification. That is the sum and substance we think of the point urged in In re Wilson, supra."

See also In re Meadows, Williams & Co., 173 Fed. 694 (District Court W. D. New York), and same case on appeal to the Circuit Court of Appeals for the Second Circuit, 177 Fed. 1004, wherein the ruling of the district court was upheld in a memorandum opinion reading as follows:

"PER CURIAM. This controversy comes here on petition to review an order of the District Court for the Western District of New York (173 Fed. 694), directing the trustee in bankruptcy of Meadows, Williams & Co. to deliver to Alice H. Douglas two certificates, for 100 shares each, of the preferred stock of the Great Northern Railway Company. The proof establishes the fact that Mrs. Douglas bought and paid for 200 shares of the stock of the Great Northern Railway Company. The certificates were issued in her name. They were bought and paid for prior to the adjudication in bankruptcy. The trustee in bankruptcy refuses to deliver them to her. We think the general creditors of the bankrupt have no interest whatever in these shares. They belong, without reduction of any kind, to Mrs. Douglas. She is as much entitled to their possession as she would be to have any other property of hers which was left in the safe-keeping of the bankrupts returned to her upon demand. The case of Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, which arose in this circuit, is a complete answer to the contention of the trustee. The petition to review should be dismissed, with costs."

Having reached the conclusion that there was ample and adequate testimony to support the judgment rendered by the learned chancellor in the circuit court, and, that the objections urged by appellant receiver against the delivery of the certificate of shares of Radio stock in controversy to respondent, are not well founded it follows that the judgment of the trial court should be affirmed, and, it is so ordered. *Becker* and *McCullen, JJ.,* concur.